UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
DR. LESTER FLEMING,

                Plaintiff,

    -against-

                                          05 CV 5386 (RJD) (MDG)

THE STATE UNIVERSITY OF NEW YORK
and DR. AUDREE BENDO,

                Defendants.

-----------------------------------------------------------X

        Gary Phelan
        Attorney for Plaintiff
        Outten & Golden LLP
        New York, New York

        Peter Sistrom
        Attorney for Defendants
        Office of the Attorney General
        New York, New York

DEARIE, Chief Judge.

        Plaintiff Dr. Lester Fleming brings this action pursuant to Title II of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq.; Section 504 of the Rehabilitation Act, 29

U.S.C. § 794; and 42 U.S.C. § 1983. Plaintiff completed his medical residency at the Health

Science Center at Brooklyn, a facility operated by defendant State University of New York

("SUNY"), under the supervision of defendant Dr. Audree Bendo. He claims that defendants

improperly disclosed to his prospective employer that he has sickle cell anemia, with the result

that he lost his offer of employment. Defendants now move to dismiss pursuant to Rules

12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons explained below,

defendants' motion is granted in part, and denied in part.

## BACKGROUND

Plaintiff is an anesthesiologist who suffers from sickle cell anemia. Am. Compl. ¶ 8. In 2002, having completed medical school and an internship in internal medicine, he began an anesthesiology residency at SUNY's Health Science Center at Brooklyn. Id. ¶¶ 13-15.

In July 2002, near the beginning of his residency, plaintiff was hospitalized due to complications of sickle cell disease. Id. ¶ 31. Plaintiff informed Dr. Banu Lokhandwala, SUNY's Director of Residency Education at Long Island College Hospital, that he was in the hospital, but did not indicate the reason for his hospitalization. Id. Plaintiff claims that during a subsequent telephone call with defendant Dr. Audree Bendo, his supervisor and the director of his residency program, he disclosed to Dr. Bendo that he had sickle cell anemia. Id. ¶¶ 22, 31. Dr. Bendo informed him that he would need a doctor's letter in order to return to work. Id. ¶ 31. Following his recovery, plaintiff obtained such a letter, returned to work, and completed the remainder of his residency without incident. Id. ¶¶ 31-33.

In April 2005, near the end of his residency, plaintiff applied for a position at the Yuma Regional Medical Center ("Yuma") in Yuma, Arizona. Id. ¶ 16. In May 2005, he was offered the position, and he and representatives of Yuma signed an employment contract. Id. ¶¶ 17-18. Yuma then conducted a "credentialing process" that included making inquiries of plaintiff's former employers. Id. ¶¶ 20-21.

During the credentialing process, plaintiff claims, Dr. Bendo sent Yuma a letter regarding plaintiff. Id. ¶ 22. Either in this letter or otherwise, on plaintiff's account, Dr. Bendo disclosed to Yuma that plaintiff had sickle cell anemia. Id. ¶ 28. On August 30, 2005, Dr. Richard

2

Watson, Acting Chairman of the Yuma Anesthesia Medical Services Group ("YAMS"), told plaintiff that Dr. Bendo's letter had raised "red flags," and that he should seek alternative employment. Id. ¶¶ 24-25. On September 1, 2005, plaintiff was advised by Dr. David Diuguid, his hematologist, that Yuma had contacted him in order to confirm a statement made by Dr. Bendo. Id. ¶ 27-28.

Plaintiff claims that during a September 29, 2005 conference call, Yuma officials asked about his health, asked why he had not informed them that he had sickle cell anemia, and advised him that they would require him to sign an addendum to his employment contract. Id. ¶¶ 34, 37, 39. The addendum, which plaintiff received on November 4, 2005, provided that Yuma would employ plaintiff only if he acknowledged, in the words of the complaint, "that it would not be possible for [Yuma] to provide him a reasonable accommodation for his operating room and call schedules." Id. ¶¶ 40-41. Plaintiff refused to sign the addendum, and now characterizes Yuma's insistence that he do so as a constructive termination. Id. ¶¶ 42-43.

On November 16, 2005, plaintiff began this lawsuit.[1] His complaint alleges that notwithstanding his own efforts to keep his medical records confidential, and without his consent, Dr. Bendo wrongfully divulged to Yuma that he has sickle cell anemia, with the result that Yuma denied him employment. On this basis, plaintiff charges SUNY with violations of the ADA and of Section 504 of the Rehabilitation Act. Plaintiff alleges, as well, that Dr. Bendo

---

[1] In addition, on December 1, 2005, plaintiff sued Yuma and YAMS in federal court in Arizona, alleging violations of Arizona employment law and of Section 504 of the Rehabilitation Act. In an order dated July 20, 2007, based on its conclusion that plaintiff acted as an independent contractor with respect to YAMS, the Arizona court granted summary judgment for YAMS. Plaintiff's claims against Yuma were dismissed on August 1, 2007 pursuant to a stipulation between the parties.

violated his right to privacy under the Fourteenth Amendment Due Process Clause, and seeks to recover damages from her pursuant to 42 U.S.C. § 1983. Defendants move to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## DISCUSSION

A.    **Standards of Review**

The Federal Rules of Civil Procedure require that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so that the defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests," Conley v. Gibson, 355 U.S. 41, 47 (1957). In considering a Rule 12(b)(6) motion to dismiss a complaint for failure to state a claim, the Court "tak[es] as true the facts alleged in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 699-700 (2d Cir. 1994).

Ordinarily, in deciding a Rule 12(b)(6) motion, the Court may consider only the complaint itself. However, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)). Further, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." Id. at 153 (quoting Int'l Audiotext, 62 F.3d at 72).

On a motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1), the Court takes

4

a different approach. There, the Court "accept[s] as true all material factual allegations in the complaint," but "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." Atl. Mut. Ins. Co. v. Balfour MacLaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992). Moreover, in deciding such a motion, the Court is free to consider materials beyond the pleadings. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). The plaintiff bears the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists. Id.

**B.     Americans with Disabilities Act**

Plaintiff first asserts a claim under the confidentiality provisions of the Americans with Disabilities Act. The ADA consists of five titles, of which the first two are relevant here. Title I, which prohibits employment discrimination, permits employers to inquire about employees' disabilities only under limited circumstances, declaring that an employer "shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Where an employer acquires information about an employee's disability, that information is to be "maintained on separate forms and in separate medical files and . . . treated as a confidential medical record . . . ." 42 U.S.C. § 12112(d)(3)(B). Such information may be divulged only to work supervisors where relevant to necessary restrictions or accommodations, to government officials investigating ADA compliance, or to first aid and safety personnel. Id. Title II, meanwhile, governs the "services, programs, and activities" of public entities. In relevant part, it provides: "Subject to the provisions of this subchapter, no qualified individual with a disability

5

shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356 (2001), in which the Supreme Court held that the Eleventh Amendment bars Title I suits against state defendants seeking money damages, precludes plaintiff from pursuing this litigation under Title I. Pl.'s Mem. Opp'n Mot. Dismiss [hereinafter Pl.'s Mem.] at 4. Plaintiff observes, however, that Title II's implementing regulations "adopt Title I's list of prohibited conduct," and argues that because defendants' alleged disclosure of plaintiff's sickle cell anemia did not comply with Title I's requirements regarding the confidentiality of employees' medical information, it constitutes a violation of Title II, whose application to state defendants the Eleventh Amendment does not categorically bar. Id. at 4 n.29. Defendants respond that this Court lacks subject matter jurisdiction to hear plaintiff's ADA claims, because Title II does not apply to employment discrimination, Defs.' Mem. Supp. Mot. Dismiss [hereinafter Defs.' Mem.] at 13-16, and because plaintiff's suit under Title II is barred by the Eleventh Amendment, id. at 7-13. Defendants argue further that even if Title I's confidentiality provisions apply, plaintiff has failed to state a claim under those provisions. Id. at 16-23.

The law is unsettled as to whether Title II of the ADA covers employment discrimination. Without answering the question itself, the Supreme Court has acknowledged a split of opinion among the circuits. Garrett, 531 U.S. at 360 n.1 ("[N]o party has briefed the question whether Title II of the ADA . . . is available for claims of employment discrimination when Title I of the ADA expressly deals with that subject. . . . The Courts of Appeals are divided on this issue . . .

6

.""). Nor has the Second Circuit offered an answer. See Perry v. State Ins. Fund, 83 Fed. Appx.

351, 354 n.1 (2d Cir. 2003) ("There remain questions regarding . . . whether Title II ADA

violations can be based on employment discrimination . . . .") (unpublished); Mullen v.

Rieckhoff, No. 98-7019, 1999 U.S. App. LEXIS 18150, at *2 ("[P]laintiff rightfully points to a

split of authority over whether an employment discrimination plaintiff may avoid the ADA's

requirement of an EEOC charge by filing under Title II of that Act. . . . [W]e need not reach that

question.").[2] The two circuits that have confronted the question directly have reached opposite

results. Compare Bledsoe v. Palm Beach County Soil & Water Conservation Dist., 133 F.3d

816, 820 (11th Cir. 1998) (holding that Title II covered employment discrimination),

with Zimmerman v. Oregon Dep't of Justice, 170 F.3d 1169, 1183-84 (9th Cir. 1999) (holding

that it did not). Meanwhile, "[t]he Fourth, Fifth and Tenth Circuits appear to have assumed,

without deciding, that Title II applies to [discrimination in] public employment." Clifton v.

Georgia Merit Sys., No. 1:05-CV-3272, 2007 U.S. Dist. LEXIS 19351, at *18-19 (N.D. Ga. Mar.

---

[2]In a 1997 decision, the Second Circuit held that the second clause of Title II's anti-discrimination provision, which provides that no qualified individual with a disability shall "be subjected to discrimination by any [public] entity," applied to discriminatory zoning decisions, and described that clause as "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context." Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 44-45 (2d Cir. 1997). Some district courts of this circuit, in holding that Title II applies to employment discrimination, have cited this language. See, e.g., Bloom v. New York City Bd. of Educ., No. 00 Civ. 2728, 2003 U.S. Dist. LEXIS 5290, at *31-33 (S.D.N.Y. Apr. 2, 2003) (quoting Winokur v. Office of Court Admin., 190 F. Supp. 2d 444, 449 (E.D.N.Y. 2002)); Worthington v. City of New Haven, No. 3:94-CV-0609, 1999 U.S. Dist. LEXIS 16104, at *18-20 (D. Conn. Oct. 5, 1999). As Perry and Mullen demonstrate, however, Innovative Health Systems does not answer the question whether Title II covers employment discrimination. Even courts answering this question in the affirmative have cautioned against over-reading the Second Circuit's use of the term "catch-all phrase." See, e.g., Transp. Workers Union of Am., Local 100 v. New York City Transit Auth., 342 F. Supp. 2d 160, 171 (S.D.N.Y. 2004) ("The seemingly broad scope of the court's language notwithstanding, it is important to read these words in context.").

6, 2007) (citing Davoll v. Webb, 194 F.3d 1116, 1130 (10th Cir. 1999); Holmes v. Texas A&M Univ., 145 F.3d 681, 684 (5th Cir. 1998); Doe v. Univ. of Maryland Med. Sys., 50 F.3d 1261, 1265 (4th Cir. 1995)). But the Sixth Circuit has observed, in a case concerning Title III, that the only portion of the ADA to address employment discrimination is Title I. Id. at *19-20 (quoting Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006, 1014 (6th Cir. 1997)).

District courts in the Second Circuit have taken divergent approaches. Compare Olson v. New York, No. 04-CV-0419, 2005 U.S. Dist. LEXIS 44929, at *13 (E.D.N.Y. Mar. 9, 2005) (holding that Title II covered employment discrimination); Transp. Workers Union, 342 F. Supp. 2d 160 (same); Bloom, 2003 U.S. Dist. LEXIS 5290, at *33 (same); Winokur, 190 F. Supp. 2d at 449 (same); Magee v. Nassau County Med. Ctr., 27 F. Supp. 2d 154, 159 (E.D.N.Y. 1998) (same), with Ayantola v. Community Technical Colls. of the State of Connecticut, No. 3:05CV957, 2007 U.S. Dist. LEXIS 23547, at *5 (D. Conn. Mar. 30, 2007) (holding that Title II did not cover employment discrimination); Cormier v. City of Meriden, No. 3:03cv1819, 2004 U.S. Dist. LEXIS 21104, at *34 (D. Conn. Sept. 30, 2004) (same); Filush v. Town of Weston, 266 F. Supp. 2d 322, 327 (D. Conn. 2003) (same); Syken v. New York Exec. Dep't, Div. of Housing & Community Renewal, No. 02 Civ. 4673, 2003 U.S. Dist. LEXIS 5358, at *35 (S.D.N.Y. Apr. 2, 2003) (same); Sworn v. Western New York Children's Psychiatric Ctr., 269 F. Supp. 2d 152, 157-58 (W.D.N.Y. 2003) (same).

Defendants offer two rationales for their claim that Title II does not cover employment. First, they argue that the ADA's "text, context, and structure," and in particular its "extensive and explicit treatment of employment discrimination in Title I," demonstrate that Congress intended that such discrimination not be addressed by Title II. Defs.' Mem. at 14. Second, they argue that

permitting plaintiffs to sue state employers under Title II would "flout Garrett's holding that Congress did not have the authority to legislate against disability discrimination in public employment." Id. at 16. Because the second of these arguments essentially restates defendants' Eleventh Amendment defense, the Court focuses on the first.

Defendants recommend the approach taken by the Ninth Circuit in Zimmerman, 170 F.3d 1169. There, noting that the ADA's implementing regulations expressed the view of the Department of Justice ("DOJ") that Title II *did* apply to employment discrimination, the court applied the two-step analysis described in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), to determine whether it should defer to those regulations in interpreting Title II's core language, which declares that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The court concluded its analysis at the first Chevron step, having found that Congress "unambiguously expressed its intent for Title II *not* to apply to employment." Zimmerman, 170 F.3d at 1173 (emphasis added). In reaching this conclusion, the court reasoned that the first clause of Section 12132 ("be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity"), by its plain language, did not cover employment, and that the second clause ("be subjected to discrimination by any such entity") was not independent of the first, but instead supplemented the first clause's prohibition on disparate treatment with a prohibition on *intentional* discrimination. Id. at 1176. It also cited five structural features of the ADA as bolstering its conclusion, e.g., that of the ADA's five titles, only Title I, not Title II, expressly pertains to employment discrimination. Id.

9

at 1176-78. Finally, it expressly declined to follow those courts that previously had found that Title II applied to employment discrimination, including those that had relied on the DOJ regulations or on suggestions in the ADA's legislative history that Congress intended Title II to apply to employment discrimination. Id. at 1183.

A closer examination of the five structural features of the ADA discussed in Zimmerman will be helpful, because that discussion is echoed in later decisions reaching the same result. See, e.g., Cormier, 2004 U.S. Dist. LEXIS 21104 at *22; Filush, 266 F. Supp. 2d at 329-31. First, the court pointed to the fact that of the ADA's five titles, only Title I specifically addresses employment, while Title II is "devoid of any employment provisions." Id. at 1176. Second, it noted the differences between the definitions of "qualified individual" in Title I ("an individual with a disability who . . . can perform the essential functions of the employment position," 42 U.S.C. § 12111(8)) and Title II ("an individual with a disability who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity," 42 U.S.C. § 12131(2)). Zimmerman, 170 F.3d at 1176-77. Third, it suggested that certain procedural requirements in Title I (e.g., for administrative exhaustion) would be "eviscerated" by the application of Title II to employment discrimination. Id. at 1176-78. But see Cormier, 2004 U.S. Dist. LEXIS 21104, at *22 (noting that "[t]he Second Circuit has not decided the issue, but has *suggested* that Title II may not require exhaustion") (emphasis supplied) (citing Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565 (2d Cir. 2003)). Fourth, the court noted that Congress had charged different agencies with implementing Titles I (EEOC) and II (DOJ). Zimmerman, 170 F.3d at 1178. Finally, it pointed out that Congress linked the Rehabilitation Act of 1973, which governs employment, with Title I—e.g., by amending the

Rehabilitation Act to adopt Title I's standards—rather than linking it with Title II. Id. at 1178. But see 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of [Title II].").

Several district courts in this circuit have followed Zimmerman; some, in doing so, have elaborated on the Ninth Circuit's structural analysis. Exemplary is Cormier, which includes a lengthy discussion of a topic Zimmerman treats briefly: the remedies available under Titles I and II. 2004 U.S. Dist. LEXIS 21104, at *20-29. Since "Title I requires presuit exhaustion of administrative remedies but Title II does not," the Cormier court argued, applying Title II to employment claims would "render [Title I's exhaustion] requirement a nullity for a significant class of covered employees." Id. at *24. The court noted, as well, that while Title I caps compensatory damages according to an employer's size, and prohibits punitive damages against municipal employers, Title II does not, and expressed its reluctance to "read[] the ADA in such a way as to effectively nullify some of Title I's statutory limitations." Id. at *25-26. Finally, noting that Title I applies only to employers with at least fifteen employees, the court suggested that although Title II therefore could be read as intended to offer special protection to individuals employed by state or municipal entities with fewer than fifteen employees, there was no need to adopt "[s]uch an awkward reading," since such individuals could seek relief under the Rehabilitation Act, provided that their employers received federal funding. Id. at *27-28.

District courts of this circuit also have looked to the Supreme Court for guidance. Here again, Cormier is exemplary. Citing the Court's observation in Tennessee v. Lane, 541 U.S. 509, 516-17 (2004), that the ADA covered "three major areas of public life: employment, which is

11

covered by Title I of the statute; public services, programs, and activities, which are the subject

of Title II, and public accommodations, which are covered by Title III," the <u>Cormier</u> court

characterized this language from <u>Lane</u> as offering "a fairly strong indication" that the Supreme

Court would not read Title II as covering employment. 2004 U.S. Dist. LEXIS 21104, at *17-20.

Likewise, in <u>Syken</u>, another district court of this circuit, in holding that Title II did not cover

employment discrimination, adverted to the fact that immediately after the <u>Garrett</u> Court declined

to say whether Title II of the ADA applies to employment, it observed that "where Congress

includes particular language in one section of a statute but omits it in another section of the same

Act, it is generally presumed that Congress acts intentionally and purposely in the disparate

inclusion or exclusion." 2003 U.S. Dist. LEXIS 5358, at *22 (quoting <u>Garrett</u>, 531 U.S. at 360

n.1 (citation omitted)). Thus, the <u>Syken</u> court argued, the Court "seemed to signal that it would

not find Title II applicable to employment discrimination cases." <u>Id.</u>

On the other side of the ledger, the leading case is <u>Bledsoe</u>, in which the Eleventh Circuit

found that the second clause of Title II's anti-discrimination provision ("be subjected to

discrimination by any such entity") was, in the words of the Second Circuit, "a catch-all phrase

that prohibits all discrimination by a public entity, regardless of the context," 133 F.3d at 822

(quoting <u>Innovative Health Sys.</u>, 117 F.3d at 44-45), and held that Title II *did* apply to

employment discrimination, <u>id.</u> at 825. The <u>Bledsoe</u> court relied in part on the ADA's legislative

history, including "[e]xtensive legislative commentary regarding the applicability of Title II to

employment discrimination." <u>Id.</u> at 821. It cited, <u>inter alia</u>, the Report of the United States

House of Representatives Judiciary Committee, which states: "[I]n the area of employment, title

II incorporates the duty set forth in the regulations for Sections 501, 503, and 504 of the

Rehabilitation Act to provide a 'reasonable accommodation' that does not constitute an 'undue hardship.'" Id. (citing H.R. Rep. No. 101-485(III) at 50 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 473). The court relied, as well, on the fact that Title II's implementing regulations make employment discrimination actionable under Title II, and quoted the regulations at length:

> (a) No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity.
>
> (b)(1) For purposes of this part, the requirements of title I of this Act, [as established by the regulations of the Equal Employment Opportunity Commission in 29 CFR part 1630,] apply to employment in any service, program, or activity conducted by a public entity if that public entity is also subject to the jurisdiction of title I [i.e. employs fifteen or more employees].
>
> (b)(2) For the purposes of this part, the requirements of section 504 of the Rehabilitation Act of 1973, as established by the regulations of the Department of Justice in 28 CFR part 41, as those requirements pertain to employment, apply to employment in any service, program, or activity conducted by a public entity if that public entity is not also subject to the jurisdiction of title I .

Id. at 822 (quoting 28 C.F.R. § 35.140) (first alteration reflects regulatory language omitted from original and restored here; second alteration in original). Finding the DOJ regulations neither "arbitrary, capricious, nor manifestly contrary to the statute," the court accorded them considerable weight. Id. at 822-23 (quoting Chevron, 467 U.S. at 844)). Finally, based on the statute, legislative history, and regulations, and on relevant Eleventh Circuit precedent, the court concluded that Title II of the ADA did, indeed, apply to employment. Id. at 824.

As noted above, several district courts of this circuit have followed suit. Some have described the "weight of authority" as supporting this conclusion. See, e.g., Bloom, 2003 U.S. Dist. LEXIS 5290, at *33; Worthington, 1999 U.S. Dist. LEXIS 16104, at *18-19. Others have offered their own comprehensive analyses of the problem. One such analysis appears in

Transport Workers Union, 342 F. Supp. 2d 160. There, the court conceded that "whether Title II of the ADA covers employment discrimination claims remains an open question." Id. at 172. It also noted, however, that Congress had intended the ADA, in conjunction with other federal anti-discrimination laws, to "provide a comprehensive regime designed to combat discrimination that 'invokes the sweep of congressional authority.'" Id. at 173 (quoting 42 U.S.C. § 12101(b)(4)). "Given this broad congressional mandate," the court declared, it was "at least . . . *plausible*" that Title II was intended to apply to employment discrimination. Id. The court rejected the argument that reading Title II to include employment discrimination would render Title I redundant, pointing to differences in the titles' scope (e.g., Title I applies only to employers with at least fifteen employees, permits compensatory and punitive damages, and requires administrative exhaustion), and arguing that "there is nothing 'redundant' about Congress creating overlapping rights, especially in the area of discrimination." Id. at 174 (citation omitted). Finally, like the Eleventh Circuit in Bledsoe, the court looked to the DOJ regulations implementing Title II, as well as to the ADA's legislative history, and found that both supported the conclusion that Title II applied to employment discrimination. Id. at 174-75. But see Cormier, 2004 U.S. Dist. LEXIS 21104, at *29-33 (questioning Bledsoe's interpretation of the legislative history).

Having considered the merits of these divergent approaches to the question whether Title II of the ADA applies to employment discrimination, the Court holds that it does not. Like the Ninth Circuit in Zimmerman, this Court finds that the language of the statute is clear and unambiguous, and ascribes no weight to the regulations and legislative history cited by plaintiff. The ADA includes a title devoted exclusively to employment; it is Title I. Title I expressly

14

prohibits discrimination based on disability with regard to all "terms, conditions, and privileges of employment," identifies "covered individuals" in terms of their ability to perform job functions, and charges the EEOC with enforcement. The very provisions plaintiff wishes to enforce—those governing employers' inquiries into and disclosure of information about their employees' health status—are contained in Title I. Title II, meanwhile, says nothing about the sort of disclosure plaintiff alleges, or about any other employment practice. As the Supreme Court pointed out in Garrett, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." 531 U.S. at 360 n.1 (citation omitted). The ADA makes plain that Congress intended it as a "comprehensive mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(4). But the ADA's structure and terms also make clear that Congress expressed its intent to combat *employment* discrimination through Title I of the ADA—not Title II. Thus plaintiff cannot sue for employment discrimination under Title II, and defendants' motion to dismiss this portion of the complaint must be granted.

Finally, because the Court grants defendants' motion on the basis of its finding that Title II does not cover employment discrimination, it need not reach defendants' argument that the Eleventh Amendment bars this suit. However, the Court notes that to the extent that plaintiff has styled his lawsuit as sounding in Title II in an effort to circumvent Garrett's holding that Title I's prohibition on disability-based employment discrimination does not apply to state employers, the Court may not permit him to do so.

15

## C.    Rehabilitation Act Section 504

Plaintiff also asserts a claim under Section 504 of the Rehabilitation Act, which provides

that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance . . . ." 29

U.S.C. § 794(a).  In defining a violation, Section 504 adopts the substantive standards described

in Title I of the ADA:  "The standards used to determine whether this section has been violated

in a complaint alleging employment discrimination under this section shall be the substantive

standards applied under title I of the Americans with Disabilities Act . . . ." 29 U.S.C. § 794(d).

Defendant SUNY does not claim that the Eleventh Amendment immunizes it against suit

under Section 504.  See Degrafinreid v. Ricks, 417 F. Supp. 2d 403, 414 (S.D.N.Y. 2006) ("New

York's continued acceptance of federal funds . . . constitutes a waiver of sovereign immunity as

to all of plaintiff's Rehabilitation Act claims.").  Instead, defendants argue that the conduct

plaintiff alleges—improper disclosure of confidential medical information—does not constitute

"employment discrimination" for the purposes of 29 U.S.C. § 794.  Defs.' Mem. at 24.

Defendants argue further that even if a violation of Title I's confidentiality provisions does

constitute employment discrimination under Section 504, plaintiff fails to state a claim under

those provisions.  Id. at 16-23 & 25 n.12.

Neither the Supreme Court nor the Second Circuit has decided whether a violation of

Title I's confidentiality provisions constitutes employment discrimination for Section 504

purposes.  Indeed, research reveals that few courts in any circuit have confronted the question

directly.  Defendants cite Stokes v. Barnhart, 257 F. Supp. 2d 288, 295 (D. Me. 2003), in which a

16

district court of the First Circuit, observing that "the importation of the standards established by the [ADA] into the Rehabilitation Act by subsection (d) is limited to complaints alleging employment discrimination," held that a complaint describing an improper disclosure of medical information did not allege employment discrimination within the meaning of Section 504. But Stokes is distinguishable, since the plaintiff there was not the defendants' employee, but rather their patient. Id. at 295.[3] Moreover, at least one district court appears to have concluded that violations of Title I's confidentiality provisions *are* actionable under the Rehabilitation Act. Brady v. Potter, No. 02 Civ. 1121, 2004 U.S. Dist. LEXIS 7689, at *9-11 (D. Minn. Apr. 30, 2004) (denying summary judgment where a plaintiff alleged that an employer's pre-hire inquiry into her medical history violated Section 504).[4]

Nor is this question resolved by the holdings of four circuit courts, cited by defendants, that an individual need not be disabled in order to sue under Title I's confidentiality provisions.

---

[3]Similarly unhelpful to defendants is Shaver v. Independent Stave Company, 350 F.3d 716, 722 (8th Cir. 2003), which they cite for the proposition that "employment discrimination and disclosure of medical information 'are different wrongs, involving different interests,'" Defs.' Mem. at 25. But the Eighth Circuit actually held that *"workplace harassment* and the unauthorized disclosure of medical records are different wrongs, involving different interests." 350 F.3d at 722 (emphasis added).

[4]The Court also notes the holding of another district court of this circuit that 42 U.S.C. § 2000d-7(a)(1), which expresses Congress's intent to abrogate the states' Eleventh Amendment immunity with respect to violations of "any . . . Federal statute prohibiting discrimination," did not encompass violations of 42 U.S.C. § 290dd-2(a), which requires that the medical records of patients in federally assisted substance abuse programs be kept confidential. Ohta v. Muraski, No. 3:93 CV 0554, 1993 U.S. Dist. LEXIS 12693, at *21-27 (D. Conn. Aug. 19, 1993). There, Judge Cabranes observed: "A violation of § 290dd-2 does not amount to 'discrimination' in substance abuse or other medical 'admission or treatment,' but merely to the unlawful disclosure of medical records. There is no necessary connection between the two wrongs . . . ." Id. at *25. Even were Ohta controlling, however, its reasoning would not necessarily apply to this case, which concerns a different statute and different facts.

Defs.' Mem. at 24 (citing Conroy v. New York State Dep't of Corr. Servs., 333 F.3d 88, 94 (2d Cir. 2003); Cossette v. Minnesota Power & Light, 188 F.3d 964, 969-70 (8th Cir. 1999); Fredenburg v. Contra Costa County Dep't of Health Servs., 172 F.3d 1176, 1182 (9th Cir. 1999); Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1229 (10th Cir. 1997)). The necessary implication of these cases, defendants contend, is that Title I's discrimination provisions do not "control" its confidentiality provisions. Defs.' Reply Mem. Supp. Mot. Dismiss [hereinafter Defs.' Reply Mem.] at 9. Otherwise, they argue, plaintiffs alleging improper disclosure would have to prove they were (or were perceived to be) disabled, since doing so is an element of a prima facie case of employment discrimination under the ADA. Id.

Conroy, the only Second Circuit case among the four cited by defendants, does not support defendants' claim.[5] At issue in Conroy was whether a plaintiff could mount an ADA challenge to her employer's policy of inquiring about employees' health without proving that she had a disability of which her employer was not already aware. The court found that she could, observing that "it makes little sense to require an employee to demonstrate that he has a disability to prevent his employer from inquiring as to whether or not he has a disability." 333 F.3d at 95 (quoting Roe, 124 F.3d at 1229). Conroy demonstrates the Second Circuit's unwillingness to require plaintiffs alleging violations of Title I's confidentiality provisions to prove the first element of a prima facie ADA case—but it by no means requires the conclusion that violations of those provisions do not constitute employment discrimination.

---

[5] As explained below, two of the other decisions cited by plaintiffs, Fredenburg, 172 F.3d 1176, and Cossette, 188 F.3d 964, come nearer to inviting the conclusion plaintiffs urge; however, neither controls this Court's interpretation of the statutory provisions at issue here. Defendants' fourth case, Roe, 124 F.3d 1221, takes essentially the same approach as Conroy.

In the absence of clear guidance from the Second Circuit, the Court confronts a problem

of statutory interpretation. As noted above, Section 504 adopts Title I's substantive standards

with respect to "complaint[s] alleging employment discrimination." 29 U.S.C. § 794(d).

Subsection (a) of 20 U.S.C. § 12112, Title I's key substantive provision, declares: "No covered

entity shall discriminate against a qualified individual with a disability because of the disability

of such individual in regard to job application procedures, the hiring, advancement, or discharge

of employees, employee compensation, job training, and other terms, conditions, and privileges

of employment." Subsection (d), meanwhile, which contains the confidentiality provisions

invoked by plaintiff, begins with the following statement: "The prohibition against

discrimination as referred to in subsection (a) shall include medical examinations and inquiries."

The remainder of Subsection (d)—consisting of Subsections (d)(2), (d)(3), and (d)(4)—describes

specific restrictions on employers' inquiries into and disclosure of their employees' disabilities.

The key question, then, is how to read Section (d)(1). On one hand, Section (d)(1)

appears likely to reflect the intent of Congress that violations of the confidentiality provisions

described in the remainder of Section (d) be construed as employment discrimination within the

meaning of Section (a). In other words, Subsection (d)(1) plausibly can be read to say that

Section (a)'s prohibition against discrimination "shall include [violations of the provisions

governing] medical examinations and inquiries." This appears to be plaintiff's reading of the

statute. See Pl.'s Mem. at 14-15. Another reading is possible, however: that violations of Title

I's confidentiality provisions, if carried out in a discriminatory fashion against qualified

individuals, constitute discrimination within the meaning of Section (a). In other words, Section

(a)'s prohibition against discrimination "shall include [discrimination by means of] medical

19

examinations and inquiries." Defendants urge the Court to adopt this second reading. Defs.'
Mem. 24-25.

Defendants cite <u>Fredenburg</u>, in which the Ninth Circuit, like the Second Circuit in
<u>Conroy</u>, held that plaintiffs were not required to prove they were disabled in order to sue under
Title I's confidentiality provisions. 172 F.3d at 1182. The <u>Fredenburg</u> court found that
Subsection (d)(1) did not import Subsection (a)'s "qualified individual" requirement into
Subsection (d) as a whole: "[T]he restrictive language of section 12112(a)—incorporated by
reference in section 12112(d)(1)—does not apply to subsections (d)(2), (d)(3), and (d)(4)." <u>Id.</u>
Rather, the court said, "Subsection (d)(1) states a general principle—medical examinations may
not be used to discriminate against qualified persons with a disability—and categorically directs
courts to treat medical examinations as possible evidence of discriminatory conduct." <u>Id.</u>
Defendants also cite <u>Cossette</u>, in which the Eighth Circuit took a similar approach, declaring that
"[a]lthough subsection (d)(1) provides that subsection (a)'s general prohibition against
discrimination shall include discrimination on the basis of medical examinations and inquiries,
that provision is only one of several protections afforded by subsection (d), and it is only
discrimination itself (and not illegal disclosure) that requires a showing of disability." 188 F.3d
at 969.

Having considered the two available readings of Subsection (d)(1), the Court concludes
that it is not necessary to choose between them in order to decide whether plaintiff has stated a
claim under Section 504—since, under either reading, plaintiff's claim survives. Under the first
reading, according to which Subsection (d)(1) expressly includes violations of Subsection (d)'s
confidentiality requirements within Subsection (a)'s ban on discrimination, there is no question

that plaintiff's claim is safe. Under the second reading, by contrast, it is not the case that all violations of Subsection (d)'s confidentiality requirements fall within Subsection (a)'s ban. A non-disabled plaintiff could not claim discrimination where an employer disclosed his health information in violation of Subsection (d). It might even be possible for a *disabled* plaintiff to claim a violation of Subsection (d) without alleging discrimination. But even under the second reading, where an employer *discriminates* against a disabled individual by violating Subsection (d), Subsection (a) *is* violated. Here, plaintiff alleges just such a violation. Subsection 12112(b), which provides guidelines for construing Title I, indicates that "[a]s used in subsection (a), the term 'discriminate' includes . . . classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee . . . ." Plaintiff claims that defendants described him to Yuma as suffering from sickle cell anemia, thus classifying him as an individual with a disability, and that this classification had an adverse effect on his employment opportunities. Thus, while acknowledging the ambiguity of Section (d)(1), the Court finds that under either of the two readings advanced by the parties, plaintiff has alleged discrimination within the meaning of Section (a), and therefore also within the meaning of 29 U.S.C. § 794.

Defendants' second argument is that even if the Court finds that the violation of Title I's confidentiality provisions alleged by plaintiff constitutes "employment discrimination" for Section 504 purposes, plaintiff has failed to state a claim under those provisions. More specifically, defendants argue that the telephone call during which Dr. Bendo allegedly learned of plaintiff's sickle cell anemia does not constitute an "inquiry" within the meaning of Title I. Defs.' Mem. at 17. Defendants argue that the requirement of 42 U.S.C. §§ 12112(d)(3)(B) that

21

employees' medical information be maintained in confidence is triggered only in limited

circumstances, including where an employer has inquired "into the ability of an employee to

perform job related-functions" or has conducted a voluntary medical examination. Id. at 18.

This requirement does *not* apply, defendants contend, where the employee voluntarily discloses

his health status during a "friendly conversation." Id. at 21-22 (quoting EEOC v. Overnite

Transp. Co., No. 7:01cv0076, 2001 U.S. Dist. LEXIS 20535, at *3 (W.D. Va. Nov. 30, 2001)).

Defendants also cite the holding of Conroy that an employer's policy of requiring employees to

submit "general diagnoses" following certain absences was not the sort of "narrowly tailored"

inquiry employers are authorized to make under 42 U.S.C. § 12112(d)(4)(B). 333 F.3d at 91.

Dr. Bendo's discovery of plaintiff's sickle cell anemia, defendants claim, occurred pursuant to a

voluntary disclosure during a friendly conversation, rather than in the context of a narrowly

tailored inquiry, and thus triggered no duty of confidentiality. Id. at 21-22. Finally, defendants

argue that even if Dr. Bendo's phone call *was* an inquiry within the meaning of 42 U.S.C. §

12112(d)(4)(B), and a duty of confidentiality *did* exist, plaintiff himself authorized the disclosure

of his medical information by signing a release. Id. at 22-23.

Plaintiff responds by pointing to certain allegations in the complaint:  that Dr. Bendo

initiated the discussion of his medical condition; that it occurred while he was in the hospital, not

while the two of them were "standing around the proverbial water cooler"; and that she asked all

the questions (defendants respond that he has alleged only one question). Pl.'s Mem. at 10.  He

contends, as well, that he has alleged facts suggesting that Dr. Bendo's question was both "job-

related" (in particular, he claims she directed that, upon his return to work, he provide a doctor's

letter declaring him fit to return), and "consistent with business necessity" (he suggests that

22

because she was the director of his residency program, and he had been in the hospital for two days already, her question reflected concern about whether his illness threatened the health of his patients). Id. at 11-12. With regard to defendants' argument based on his having signed a release, plaintiff argues that the Court may not consider the release, since it was not attached to his complaint or incorporated by reference; that the release did not authorize Yuma to inquire into or Dr. Bendo to disclose his health status; and that even if the release constituted a waiver, defendants point to no facts indicating that the waiver was knowing and voluntary. Id. at 12-14.

Defendants' suggestion that the telephone call from Dr. Bendo was merely a "friendly conversation," rather than an "inquiry" within the meaning of the ADA's confidentiality provisions, is unpersuasive. The facts of this case are easily distinguishable from those of the First Circuit case upon which defendants rely. In Overnite Transportation, the court noted that the plaintiff "occasionally . . . would talk to his co-workers, including [his supervisor], about his health," and it was through such "friendly conversations" that his employer acquired the medical information whose disclosure he challenged. 2001 U.S. Dist. LEXIS 20535 at *3. Defendants also cite three other cases involving voluntary disclosures that were found not to have triggered the ADA's confidentiality requirements. Defs.' Mem. at 19 (citing Cash v. Smith, 231 F.3d 1301, 1307 (11th Cir. 2000); Wiggins v. DaVita Tidewater, LLC, 451 F. Supp. 2d 789 (E.D. Va. 2006); Ballard v. Healthsouth Corp., 147 F. Supp. 2d 529, 534 (N.D. Tex. 2001)). But these cases, too, are distinguishable; none of the three involves allegations that an employer actually asked its employees to provide medical information. See Cash, 231 F.3d at 1303 (plaintiff told her supervisor about her diagnosis "in confidence"); Wiggins, 451 F. Supp. 2d at 792 (plaintiff directed her doctor to disclose her medical condition); Ballard, 147 F. Supp. 2d at 532 (plaintiff

decided to tell his supervisor about his diagnosis). Here, by contrast, plaintiff claims that he did *not* openly discuss his sickle cell anemia with his colleagues and supervisors; that Dr. Bendo, who was his supervisor, telephoned him while he was in the hospital and asked him why he was there; that he responded that he had sickle cell anemia; and that Dr. Bendo subsequently informed him that he would need a doctor's letter in order to return to work. Am. Compl. ¶¶ 30-31. These facts, if proven, would be more than adequate to permit the conclusion that the telephone call between plaintiff and Dr. Bendo was not merely a friendly conversation, as occurred in Overnite Transportation, and that plaintiff did not simply volunteer his health information, as occurred in the other three cases just cited, but instead that Dr. Bendo's question constituted a job-related inquiry.

Nor is dismissal required by Conroy's discussion of whether the inquiry there was "narrowly tailored." As noted above, the Conroy court rejected an employer's claim that a requirement that employees provide "general diagnoses" upon returning from sick leave was a "narrowly tailored inquiry into the employee's ability to carry out her job-related functions," and therefore permissible under the ADA. 333 F.3d at 94. Defendants argue that the question Dr. Bendo is alleged to have asked is likewise not "narrowly tailored." They imply (without conceding) that such a question would not be permissible under the ADA. Finally, insisting that the confidentiality provisions of 42 U.S.C. § 12112(d)(3) are triggered only where an employer acquires employees' health information in a manner permitted under 42 U.S.C. § 12112(d)(4), they contend that Dr. Bendo's question did *not* trigger those provisions. The perverse consequences of defendants' interpretation of the statute are obvious—essentially, on their view, the statute would say to employers: If you have acquired your employees' medical information

24

unlawfully, you are free to disclose that information in any manner you see fit. The Court will not adopt such a reading. The Conroy court did not hold that an inquiry must be "narrowly tailored" in order to comply with the ADA. Rather, having declined to find that the employer's requirement for a general diagnosis was narrowly tailored and therefore *necessarily* lawful, it remanded for further consideration of the question whether the employer's imposition of such a requirement was justified by "business necessity" within the meaning of 42 U.S.C. § 12112(d)(4)(B). 333 F.3d at 97. Thus, even if this Court were to find that the question Dr. Bendo is alleged to have asked was not "narrowly tailored," such a finding would not require the conclusion that Dr. Bendo's question violated the statute, or failed to trigger its confidentiality requirements.

Finally, with regard to the release allegedly signed by plaintiff, plaintiff is correct that the Court may not consider it at this stage. As explained above, and as articulated by the Second Circuit in Chambers, 282 F.3d at 152-53, on a Rule 12(b)(6) motion, the Court may consider material outside the complaint only under limited circumstances. None of those circumstances is present here. While the release offered by defendants may have been "attached" to the questionnaire mentioned in the complaint, Defs.' Reply Mem. at 10, see also Am. Compl. ¶¶ 21-22 (mentioning questionnaire), it is not attached to the complaint, and the complaint does not incorporate it by reference. Moreover, although *defendants* rely on the release in urging dismissal, it cannot be said that the complaint "relies heavily upon its terms and effect," Chambers, 282 F.3d at 153 (quoting Int'l Audiotext, 62 F.3d at 72), or that the release is "integral" to the complaint, id. Thus the Court may not consider the release. Defendants' motion to dismiss plaintiff's claim under Section 504 of the Rehabilitation Act is denied.

25

## D.    Section 1983

Plaintiff's final claim is that by disclosing his sickle cell anemia to Yuma, Dr. Bendo violated his right to privacy under the Fourteenth Amendment and is liable under 42 U.S.C. § 1983. Dr. Bendo responds that she is shielded by qualified immunity.

Section 1983 permits an action at law or suit in equity against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Under the doctrine of qualified immunity, however, "government officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

In analyzing a defendant's claim to be shielded by qualified immunity, the court begins by asking whether the plaintiff has alleged a violation of a statutory or constitutional right—since, if the answer is no, the court need not inquire into whether the defendant enjoys immunity. Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006). If the plaintiff has alleged such a violation, the court determines whether the defendant is entitled to immunity by conducting a two-pronged analysis. The defendant is immune from suit only "if (1) the legal right said to be violated was not clearly established at the time of the defendant's conduct; or (2) the defendant's action was objectively reasonable in light of the clearly established legal rules then in effect." Skehan v. Village of Mamaroneck, 465 F.3d 96, 107 (2d Cir. 2006). The Second Circuit has explained that "[a] right is clearly established if the contours of that right are sufficiently clear that a reasonable

26

official would understand that what he or she is doing violates that right." <u>McCullough v. Wyandanch Union Free Sch. Dist.</u>, 187 F.3d 272, 278 (2d Cir. 1999). More precisely, a right is clearly established if "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." <u>Pabon</u>, 459 F.3d at 255 (quoting <u>Anderson v. Recore</u>, 317 F.3d 194, 197 (2d Cir. 2003) (internal quotation marks omitted, alterations in original)). Meanwhile, in order to establish that her actions were objectively reasonable, a defendant official must "undertake to show that reasonable persons in [her] position would not have understood that their conduct was within the scope of the established prohibition." <u>Williams v. Greifinger</u>, 97 F.3d 699, 703 (2d Cir. 1996) (internal quotation marks and citation omitted).

As defendants observe, qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985). It is "an *immunity from suit* rather than a mere defense to liability . . . ." <u>Id.</u> Nevertheless, the Second Circuit has declared that while "[a] qualified immunity defense can be presented in a Rule 12(b)(6) motion . . . the defense faces a formidable hurdle when advanced on such a motion . . . ." <u>McKenna v. Wright</u>, 386 F.3d 432, 434 (2d Cir. 2004). Specifically, a traditional qualified immunity defense will succeed at this stage only if the facts supporting it appear on the face of the complaint. <u>Id.</u> at 436.

Defendants argue that Dr. Bendo is entitled to qualified immunity, and that plaintiff cannot proceed against her. They characterize plaintiff's Section 1983 claim as seeking to

vindicate "his purported constitutional right to maintain the confidentiality of his sickle cell anemia." Defs.' Mem. at 25-26. They contend that plaintiff had no such right, and therefore that he has not alleged a statutory or constitutional violation. Even if such a right does exist, defendants argue, it was not "clearly established" in August 2005, when the alleged disclosure occurred, and it would have been objectively reasonable for Dr. Bendo to believe that the disclosure was lawful. Id. at 27. Defendants cite Doe v. City of New York, 15 F.3d 264 (2d Cir. 1994), in which an individual infected with the human immunodeficiency virus ("HIV") sued after city officials revealed his HIV status while publicizing the settlement of a discrimination complaint; and Powell v. Schriver, 175 F.3d 107 (2d Cir. 1999), in which a prison inmate sued after guards disclosed to other inmates and guards that she was an HIV-positive transsexual. Although defendants concede that these cases reflect the Second Circuit's recognition of a right to privacy in "certain medical conditions," they argue that the privacy right applies only to "serious medical conditions" that are "excruciatingly private and intimate" and provoke "hostility and intolerance from others," and that sickle cell anemia is not such a condition. Defs.' Mem. at 27-29 (quoting Powell, 175 F.3d 111-12). Defendants argue further that the conduct alleged here is distinguishable from the "heedless" and/or "malicious" manner in which medical information was disclosed in Doe and Powell. Defs.' Reply Mem. at 4. Defendants argue, as well, that as a medical resident, plaintiff enjoyed diminished privacy rights. Defs.' Mem. at 29 (citing Shaboon v. Duncan, 252 F.3d 722 (5th Cir. 2001) (holding that a medical resident alleging a Fourth Amendment violation based on her employer's disclosure of her mental health problems enjoyed a diminished expectation of privacy)). Finally, defendants claim that it was objectively reasonable for Dr. Bendo to believe that she was acting lawfully, since plaintiff signed a release.

Id. at 29.

In response, plaintiff contends that he *does* have a clearly established constitutional right

to protect the confidentiality of his sickle cell anemia.  He cites the Supreme Court's discussion

of a constitutional privacy right protecting against the disclosure of personal information.  Pl.'s

Mem. at 16 (citing Whalen v. Roe, 429 U.S. 589, 598-600 (1977)).  He notes, as well, the Second

Circuit's recognition of a constitutional right to privacy in medical records, id. (citing, inter alia,

Doe, 15 F.3d at 267), and argues that sickle cell anemia *is* a "serious medical condition" which

can expose an individual to intolerance, id. at 17-18 (citing Powell, 175 F.3d at 111-12).

Plaintiff points to allegations in the complaint that sickle cell anemia causes him to experience

"periodic, painful attacks," that his sister died as a result of complications from sickle cell

anemia, and that Yuma rescinded his job offer when it discovered that he suffered from the

disease. Id. at 17-18 (citing Am. Compl. ¶¶ 8-9, 33, 41, 43).  Plaintiff also cites two decisions of

other circuits:  Denius v. Dunlap, 209 F.3d 944, 956 (7th Cir. 2000), which concerned a public

school employee dismissed after refusing to release confidential information to his employer, and

in which the court found a constitutional privacy right that "clearly cover[ed] medical records

and communications"; and Norman-Bloodsaw v. Lawrence Berkeley Laboratory, 135 F.3d 1260,

1270 (9th Cir. 1998), which concerned an employer's practice of testing its employees for

syphilis, sickle cell trait, and pregnancy without their knowledge or consent, and in which the

court found that "the conditions tested for were aspects of one's health in which one enjoys the

highest expectations of privacy."  Plaintiff also seeks to distinguish Shaboon, noting, inter alia,

that he was no longer a resident when the alleged disclosure occurred.  Pl.'s Mem. at 18-19.

Finally, plaintiff argues again that the Court may not consider the release cited by plaintiff, and

that even if the Court were to do so, the release would not require dismissal. Id. at 19.

The first question the Court must answer is whether plaintiff has alleged a violation of a statutory or constitutional right. As plaintiff points out, Pl.'s Mem. at 16, the Supreme Court has recognized a constitutional privacy right protecting "the individual interest in avoiding disclosure of personal matters," Whalen, 429 U.S. at 599, and the Second Circuit has held that this right encompasses "information about the state of one's health," Doe, 15 F.3d at 267, reasoning that "there are few matters that are quite so personal as the status of one's health, and few matters the dissemination of which one would prefer to maintain greater control over," id. On the other hand, defendants are correct that the protection this privacy right offers "is not unbounded." Defs.' Mem. at 28. Instead, it "var[ies] with the condition" as to which confidentiality is desired. Powell, 175 F.3d at 111. Without establishing a minimum standard that individuals must meet who seek to invoke the right to privacy in medical information, Doe indicates that the constitutional right to privacy in one's health status protects information about "serious medical condition[s]," 15 F.3d at 267, especially those that are likely to provoke "not . . . understanding or compassion but . . . discrimination and intolerance," id. Powell, likewise, suggests that the right extends to conditions that are "excruciatingly private and intimate," and "likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others," 175 F.3d at 111. The right to privacy in medical information also may be subject to waiver, see id., 175 F.3d at 112 n.1, and is conditional, requiring "a determination of whether the state's interest in disclosing the records is sufficiently substantial to overcome the individual's interest in confidentiality," Khalfani v. Sec'y, Dep't of Veterans' Affairs, No. 94-CV-5720, 1999 U.S. Dist. LEXIS 2791, at *9 (E.D.N.Y. Mar. 10, 1999) (quoting Grosso v.

30

Town of Clarkstown, No. 94 Civ. 7722, 1998 U.S. Dist. LEXIS 13772, at *30-31 (S.D.N.Y. Sept. 3, 1998)). See also O'Connor v. Pierson, 426 F.3d 187, 201-02 (2d Cir. 2005) ("That [plaintiff] has a constitutionally protected privacy interest in his [medical] records does not . . . mean that he need never disclose them; it means that he need not disclose them unless [defendant] has a sufficient interest to justify its request.").

However, the Court does not accept defendants' contention that "[s]ickle cell anemia . . . falls far short of the 'excruciatingly private and intimate' medical conditions that inevitably provoke 'hostility and intolerance from others,' which the Second Circuit has found constitutionally protected." Defs.' Mem. at 29. It is beyond question that sickle cell anemia is a "serious medical condition" within the meaning of the phrase at it appears in Doe.[6] Sickle cell anemia is incurable; it causes plaintiff to experience periodic, painful attacks; and it has the potential to be fatal—indeed, it caused the death of plaintiff's own sister. See Am. Compl. ¶¶ 8-9, 33. Moreover, like the medical conditions at issue in Doe and Powell, sickle cell anemia has the potential to provoke intolerance and discrimination. Defendants mischaracterize Doe and Powell as requiring that a medical condition "inevitably" provoke such reactions before finding a right to privacy. See Defs.' Mem. at 29. In fact, those cases indicate that a constitutional privacy right exists where a serious medical condition is "likely" to arouse "hostility and intolerance," Powell, 175 F.3d at 111, or where disclosure "potentially" exposes a plaintiff to "discrimination and intolerance," Doe, 15 F.3d at 267. Although research reveals only a few reported cases involving discrimination based on sickle cell anemia, see, e.g., Avery v. County of Burke, 660

---

[6]Defendants' reply brief essentially concedes this point. See Defs.' Reply Mem. at 3 ("Dr. Fleming accuses defendants of suggesting that sickle cell anemia 'is not a serious medical condition.' That is unfair.") (citation omitted).

F.2d 111, 113 (4th Cir. 1981) (vacating summary judgment for defendants accused of wrongfully sterilizing plaintiff after informing her she had sickle cell trait); Jones v. Inter-County Imaging Ctr., 889 F. Supp. 741 (S.D.N.Y. 1995) (denying motion to dismiss where plaintiff claimed wrongful termination based on sickle cell anemia), a history of such discrimination exists.

In the 1970s, motivated in part by reports that workers suffering from sickle cell anemia might be uniquely susceptible to workplace toxins, some employers began conducting genetic screening of their employees. The result was discrimination not only against sickle cell anemia sufferers, but also against those who merely exhibited a genetic predisposition to develop the disease: "Some individuals who were found to be carriers of the sickle cell trait experienced discrimination at work and from insurance companies that raised their premiums. Additionally, some job applicants were denied employment, while others were terminated from their jobs . . . . This stigmatization and discrimination was . . . exacerbated by a lack of confidentiality." Marisa Anne Pagnattaro, Genetic Discrimination and the Workplace: Employee's Right to Privacy v. Employer's Need to Know, 39 Am. Bus. L.J. 139, 147 (2001) (internal quotation marks and citations omitted). See also Melinda B. Kaufmann, Genetic Discrimination in the Workplace: An Overview of Existing Protections, 30 Loy. U. Chi. L.J. 393, 402-03 (1999) (describing history of discrimination based on sickle cell trait); Joanne Seltzer, Note: The Cassandra Complex: An Employer's Dilemma in the Genetic Workplace, 27 Hofstra L. Rev. 411, 418-20 (1998) (same). In 1976, Congress passed a statute specifically requiring Veterans' Administration hospitals to maintain the confidentiality of records relating to sickle cell anemia. 38 U.S.C. § 7332(a)(1). Several states, meanwhile, have adopted statutes expressly banning discrimination based on sickle cell trait. See, e.g., La. Rev. Stat. Ann. § 22:652.1(D) (2007)

(prohibiting insurers from discriminating based on presence of sickle cell trait); Fla. Stat. § 448.075 (2007) (prohibiting employment discrimination based on presence of sickle cell trait); N.C. Gen. Stat. § 95-28.1 (2006) (same). Finally, plaintiff himself alleges such discrimination; according to the complaint, Yuma offered him a job, only to revoke its offer upon learning of his illness. Under these circumstances, the Court cannot accept defendants' claim that sickle cell anemia "falls far short" of the conditions identified by the Second Circuit as likely to provoke discrimination and intolerance. The Court finds that plaintiff's Fourteenth Amendment right to privacy in health information *does* entitle him to confidentiality with regard to his sickle cell anemia.

Defendants' claim that the disclosure alleged here occurred under circumstances less egregious than those in <u>Doe</u> and <u>Powell</u>, and their argument, based on a Fifth Circuit case in the Fourth Amendment context, that because plaintiff was a medical resident, he had a "diminished expectation" of privacy, Defs.' Mem. at 29 (citing <u>Shaboon</u>, 252 F.3d at 723), go not to the question whether the constitutional right to privacy in medical information encompasses sickle cell anemia, but to the question whether plaintiff has alleged a violation of that right. As noted above, and as defendants observe, the privacy right in medical information is not absolute. Where the state has a sufficiently strong interest in disclosing such information, disclosure does not violate the right. In <u>Powell</u>, for example, where the plaintiff was a prison inmate, the Second Circuit balanced her right to privacy in her status as an HIV-positive transsexual against "legitimate penological interests," noting that in some cases (though not in the case before it) prison officials' need to disclose an inmate's HIV status or transsexualism might outweigh the inmate's right to maintain confidentiality. 175 F.3d at 112-13. The court also cited <u>Doe</u>'s

33

observation that in such cases, "some form of intermediate scrutiny or balancing approach is appropriate as a standard of review," and that "the state actor's interest in [disclosure] must be 'substantial.'" Id. at 112 n.2 (quoting Doe, 15 F.3d at 269-70). Here, defendants have not shown that they possessed a "substantial" interest in disclosing plaintiff's sickle cell anemia. That Dr. Bendo is not alleged to have "gossiped" about plaintiff's illness, see Oral Arg. Tr. 20, as occurred in Powell, does not require the conclusion that plaintiff has failed to allege a violation of his constitutional privacy right; nor does the fact that plaintiff was a medical resident when defendants learned of his condition.

Having determined that plaintiff has alleged a constitutional violation, the Court must address the question whether the right plaintiff seeks to vindicate was clearly established at the time of the alleged violation. Again, three factors are relevant to this inquiry: "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts were unlawful." Rodriguez v. Phillips, 66 F.3d 470, 476 (2d Cir. 1995). As these factors suggest, the core question is whether Dr. Bendo had fair warning that by disclosing plaintiff's sickle cell anemia to Yuma, she would violate his constitutional privacy rights. See Hope v. Pelzer, 536 U.S. 730, 741 (2002) (noting that where the court below considered a qualified immunity defense, "the salient question that the Court of Appeals ought to have asked is whether the state of the law [at the time of the alleged violation] gave [defendants] fair warning that their alleged treatment of [plaintiff] was unconstitutional."). The Court finds that she did.

That the Second Circuit has never expressly recognized that the constitutional right to

34

privacy in medical information encompasses sickle cell anemia does not require the conclusion

that plaintiff's right to privacy in his condition was not clearly established. The Second Circuit

has explained that "[a] court need not have passed on the identical course of conduct in order for

its illegality to be 'clearly established,'" Williams, 97 F.3d at 703. In such a case, the Second

Circuit has suggested, the proper approach is to analogize to factually similar cases. In Lauro v.

Charles, 219 F.3d 202 (2d Cir. 2000), the court found that New York City's practice of

conducting "perp walks"—that is, "walking" suspects before the press—violated the Fourth

Amendment, but reversed the district court's conclusion that the prohibition on perp walks had

been "clearly established" at the time of the violation. The court noted the absence of Supreme

Court or Second Circuit decisions finding perp walks unconstitutional—but also that this silence

did *not* settle the question whether the Fourth Amendment ban on perp walks was clearly

established, since "government officials are not liable for constitutional violations only when 'the

very action in question has previously been found unlawful.'" Id. at 215 (quoting Anderson v.

Creighton, 483 U.S. 635, 640 (1987)). Under these circumstances, the court declared, "[t]he

appropriate inquiry [was] how closely analogous the staged perp walk [was] to actions by the

police that had been held unconstitutional at the time [of the alleged violation]." Id. at 215-16.

The case most closely analogous, the Lauro court found, was Ayeni v. Mottola, 35 F.3d 680 (2d

Cir. 1994), in which it had held that the presence of the media during a search of a private home

violated the Fourth Amendment. It found that there were "differences between Ayeni and this

case that . . . render the likeness between the two less than obvious." Id. at 216. Specifically,

Ayeni concerned a search of a private home, while the case at bar concerned a seizure on a public

street. In light of these distinctions, the court declared, it was "not prepared to say that a

35

reasonable police officer should clearly have been able to discern that the search in Ayeni and the seizure in this case infringe what are merely different aspects of the same previously defined constitutional right," and found that the defendant was immune from suit. Id.

Adopting this approach, the Court finds that the cases most closely analogous to this one are Doe and Powell. It finds, as well, that those cases are sufficient to have established clearly that plaintiff had a constitutional right to privacy in his sickle cell anemia. Reasoning from the Supreme Court's recognition in Whalen of a right to privacy in personal matters, the Second Circuit in Doe announced that "the right to confidentiality includes the right to protection regarding information about the state of one's health," and that this right encompasses "any serious medical condition," but especially those conditions that potentially expose their victims to "discrimination and intolerance." 15 F.3d at 267. The holding of Doe thus plainly applies to sickle cell anemia, which, while arguably less likely than HIV to provoke discrimination and intolerance, nonetheless may do so, and indeed has done so in the past. In Powell, meanwhile, without expressly altering the contours of the medical privacy right, the court explained that it operates even in the prison context, where individual rights are significantly curtailed. 175 F.3d at 112. Powell thus indicates that the right operates a fortiori in other contexts, such as the workplace, where courts have taken a more expansive view of individual rights. The Court notes that in both cases, certain aspects of the defendants' conduct was more egregious than what has been alleged here—in particular, the potentially widespread nature of the disclosure in Doe, and the apparently malicious nature of the disclosure in Powell. But the Second Circuit's finding that the Doe plaintiff had a right to privacy in his HIV status appears independent of the manner in which the city was alleged to have disclosed that information. See 15 F.3d 266-67. And while

the Powell court relied in part upon the defendants' apparent malice in finding that no legitimate penological justification had existed for their disclosure of the plaintiff's HIV and transsexualism, 175 F.3d at 112-13, the existence of malice does not appear to have been a factor in the court's determination that the plaintiff had a constitutional right to keep that information confidential, id. at 111-12. The Court finds, therefore, that plaintiff's constitutional right to privacy in his sickle cell anemia was clearly established as of 2005, when Dr. Bendo is alleged to have disclosed it.

As for the related question whether Dr. Bendo's alleged disclosure of plaintiff's information was objectively reasonable, the Court finds that Dr. Bendo has not shown at this point that "reasonable persons in [her] position would not have understood that their conduct was within the scope of the established prohibition." Williams, 97 F.3d at 703. To support this proposition, Dr. Bendo relies upon the release, which the Court may not consider at this stage. As explained above, a qualified immunity defense in a Rule 12(b)(6) motion will succeed only if the facts supporting it appear on the face of the complaint. Here, the complaint alleges that Dr. Bendo, a physician, disclosed plaintiff's confidential medical information to a prospective employer. Discovery may reveal additional facts sufficient to show that it would have been objectively reasonable for Dr. Bendo to believe that such conduct was lawful. At this early stage, however, and on the facts on the face of the complaint, defendants' motion to dismiss plaintiff's Section 1983 claim against Dr. Bendo on the basis of qualified immunity must be denied.

## CONCLUSION

For the reasons explained above, the Court holds as follows: (1) that plaintiff's claim

under the Americans with Disabilities Act is dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction; (2) that defendants' Rule 12(b)(6) motion to dismiss plaintiff's claim under Section 504 of the Rehabilitation Act is denied; and (3) that plaintiff's claim against Dr. Bendo pursuant to 42 U.S.C. § 1983 is not barred by qualified immunity.

SO ORDERED.

Dated: Brooklyn, New York
     August **6** , 2007

s/ Chief Judge Raymond J. Dearie

_____
RAYMOND J. DEARIE
United States District Judge